UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| DARRELL EUGENE CLARK<br>    Plaintiff | CASE NO:      1:20-cv-1581 |
| VERSUS | JUDGE: |
| CITY OF ALEXANDRIA, DARYL LOUIS<br>TERRY and JERROD DANIEL  KING<br>    Defendants | MAGISTRATE JUDGE: |

---

## ORIGINAL COMPLAINT AND JURY DEMAND

---

NOW INTO COURT, through undersigned counsel of record, comes plaintiff, DARRELL EUGENE CLARK ("Plaintiff" or "Mr. Clark"), who respectfully represents that:

## JURISDICTION AND VENUE

1.      The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331 as a federal question case arising under federal law, and pursuant to supplemental jurisdiction, 28 U.S.C. § 1367.  This case is authorized and instituted pursuant to Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 18 U.S.C. § 1513, and under Louisiana law.  Plaintiff has met the jurisdictional prerequisites for this filing by filing a Charge of Discrimination with the Equal Employment Opportunity Commission and by filing suit within 90 days of receipt of his Notice of Right to Sue.

2.      Venue is proper in this court as Plaintiff was formerly employed by the defendant, CITY OF ALEXANDRIA ("the City") as an officer of the Alexandria Police Department ("APD") in Alexandria, Rapides Parish, Louisiana, all within the Western District of Louisiana.

3.      Plaintiff is an adult citizen of the United States and a resident of Rapides Parish, Louisiana.  Plaintiff was employed by the CITY OF ALEXANDRIA at its location in Alexandria, Rapides Parish, Louisiana for approximately twenty-eight (28) years.

4.      Defendant CITY OF ALEXANDRIA is a political subdivision of the State of Louisiana within Rapides Parish, and is the entity having ultimate authority, responsibility and control of and for the oversight, decisions affecting and funding of the APD, including the authorization of and for the former's force of sworn police officers. As such, the City is ultimately responsible for all local policies, procedures, practices, decisions and customs employed by its law enforcement officials, supervisors and officers, including also the ultimate responsibility for the proper hiring, training and supervision of all sworn Police Officers acting under their authority and the color of law.

5.      Defendant DARYL LOUIS TERRY ("TERRY"), in his personal or individual capacity, who at all times material herein was the duly appointed Commissioner of Public Safety for the City and oversees the City's police and fire departments, and was the direct supervisor of King as Chief of Police.  Upon information and belief, a personal

of the full age of majority and a resident of the Parish of Rapides, a person for purposes of 42 U.S.C. §§ 1981 & 1983, who can be served at 4821 Collinsburg Lane, Alexandria, LA 71303.

6.      Defendant JERROD DANIEL KING ("KING"), in his personal or individual capacity, who at all times material herein was the duly appointed Chief of the APD, the primary law enforcement officer of the City, the policy maker for the APD, and the person responsible for the proper hiring, training and supervision of all sworn police officers acting under the authority and the color of law for and within the City. Upon information and belief, a person of the full age of majority and a resident of the Parish of Rapides, a person for purposes of 42 U.S.C. § 1983, who can be served at 143 Fortune Loop, Pineville, LA 71360-9759.

## FACTUAL ALLEGATIONS

7.      Plaintiff began his employment with the APD on February 13, 1992.  Plaintiff is African-American.

8.      On June 24, 2020, by way of a Disciplinary Letter [attached hereto as Exhibit A], Plaintiff was terminated from his position as Lieutenant with the APD, which termination was based on racial discrimination, retaliation and whistle-blower protection violations.  It followed an investigation in which TERRY was an active and directing participant.

9.      The City's retaliation was stated in the written charges against me was due to my disclosing, along with several other senior African-American officers of the APD, to an agent of the Federal Bureau of Investigations ("FBI"), a civil rights violation ("excessive force") involving a firearm committed by a senior Caucasian APD officer [LT Kenneth Rachal - a former part-time employee and business associate of TERRY] upon an African-American suspect [Daquarious Deshawn Brown], which aggravated assault was recorded by LT Rachal's body camera.

10.     Plaintiff was aware of and had observed conduct of KING that constituted racial discrimination and malfeasance in office. In the Alexandria Police Department, KING was the Chief. Hence, in October 2019 Mr. Clark and three (3) other senior African-American officers of the APD, Ronnie Howard, Reggie Cooper, and Cedric Green, reported certain behavior of KING in grievances filed with the Human Resources ("H.R.") Department, which never advised the officers of any resolution [Exhibits B (Darrell Clark), C (Reggie Cooper), and D (Cedric Green)]. Each of the aforesaid senior officers were individually interviewed by the "H.R." director, and a city retained attorney, Joshua Dara.  Mr. Clark learned of the non-resolution of the grievances after contacting the H.R. Director after a prolonged lapse of time without any communication from H.R. concerning the grievances.

11.     Thereafter, Plaintiff and the aforesaid other senior African-American officers consulted with attorneys seeking legal advice relating to the apparent efforts of KING

to circumvent their positional authority in the APD.  Because of KING's history of racial utterances and prejudiced actions, these senior officers concluded that KING was orchestrating their elimination from the APD.

12.     Legal counsel with whom the senior officers consulted recommended and facilitated a Zoom audio/video conference with an agent of the FBI.  During that conference Plaintiff and the aforesaid senior officers reported the civil rights violations of LT Kenneth Rachal and the acquiescence therein by KING, TERRY and the City.

13.     Prior to this time Officer Mark Tigner was responsible for APD officer access to the National Crime Information Center ("NCIC") electronic databases, and for administration of tests on NCIC regulations and statutes.  Plaintiff does not recall participating in any NCIC classes or undergoing any tests on NCIC policies or rules, and was never given a copy of the same.  During the orchestrated investigation, LT Cedric Green was present when Officer Mark Tigner declared he could no longer submit false NCIC test results for APD officers, or words to that effect.  Apparently the NCIC tests were so difficult that Officer Tigner did not believe the majority of APD officers could obtain a passing score.  TERRY was visibly upset when he learned that Plaintiff had distributed a letter that memorialized Officer Tigner's declaration to the Director of HR, the Mayor, the City Attorney, and to the Commissioner of Public Safety [Exhibit E].  The day following that distribution and TERRY's response, Mr. Clark was terminated.

14.    Near the Zoom conference with the FBI agent, the aforesaid senior African-American officers had discussed an incident in which KING had taken control of and changed the reports of a suicide investigation conducted by APD.  Reportedly KING's family members had received material assets as a reward from the victim's family. Plaintiff accessed the NCIC to identify KING's residential address to ascertain if it constituted evidence of unexplained wealth.  That information was provided to the FBI.

## PATTERN AND PRACTICE

15.    In *United States v City of Alexandria, Louisiana, et al.,* Civil Action No. 2:77-CV-02040, United States District Court for the Eastern District of Louisiana, a complaint was filed in 1977 by the United States against thirty-three (33) defendant cities in Louisiana, including the City of Alexandria. The initial complaint alleged that each city engaged in a pattern or practice of discrimination against blacks and women in the hiring and promotion of police officers and/or firefighters in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. Among the factual allegations in the lawsuit was a contention by the United States that the defendants used entry-level and promotional examinations and other selection processes that had an adverse impact on blacks and women, and were not shown to be job-related and consistent with business necessity.

16.     In 1980, the United States and all defendants agreed to a settlement of the lawsuit that was incorporated in the Decree entered by the District Court. The Decree required that all defendants engage in an ongoing review of their police officer and firefighter selection processes for job relatedness, conduct a job analysis of each promotional classification, and establish cutoff scores and examination components to eliminate adverse impact on black and female applicants for police officer and firefighter positions.

17.     The City of Alexandria was the last jurisdiction under the Consent Decree and although it was dismissed from the Consent Decree on November 13, 2019, has not achieved substantial compliance with the objectives of the Decree. First, the City of Alexandria has not successfully developed and regularly administered selection processes for hiring and promoting police officers and firefighters that have not had a statistically significant adverse impact on black and female applicants and employees, and that those processes are job-related and consistent with business necessity. Second, the City currently may use lawful selection processes for hiring and promoting police officers and firefighters but the Caucasian officers and administration of the APD has orchestrated a concerted effort to eliminate black officers that were hired. Third, the current composition of the APD does not mirror the ethnic and racial composition within the City of Alexandria. Further, the hiring and promotional processes currently

utilized by the APD are not in substantial compliance with the contemplated objectives of the Decree.

18.    CPT Kaster Darrel Jones, an African-American, has been an APD police officer since 1983. He had started out a patrolman and worked through to the rank of sergeant.  He was  assigned to the Criminal Investigation Division or Detective Division in 1989, initially to the Juvenile Section. In October 2009 a position was created in the detective division for an administrative assistant, intended to be filled by SGT Don Weatherford, several years junior in seniority to Jones.  As a result, Jones would have to answer to a junior Caucasian sergeant.  Jones spoke with the Chief and voiced his grievance concerning this violation of civil service seniority.  The Chief then made the Juvenile Section separate from the detective division.   This lasted until SGT Weatherford departed the APD.  When Jones inquired about the position, he was told it was no longer needed and shortly thereafter he and the Juvenile Section were again part of the detective division.

19.    On March 3, 2011 Jones had sustained an ankle sprain and was wearing an ankle boot which prevented him from operating a vehicle. After twenty plus years never getting any reprimands or even being late for work in his record, Jones was told by CPT R. Wagner if Jones was late for work again a disciplinary action would brought again him.  When Jones tried to explain the situation, Wagner refused to listen. On June 30, 2011, while in the office Jones was called by CPT Wagoner and ordered to start

vacation. Since he had been threatened by Wagner with adverse disciplinary action, Jones complied immediately with this order, although Jones tried to explain he had duties during the period. After returning from vacation on July 12, 2011, Jones was asked by CPT Wagoner if he was aware of his duty to review weekend reports the week after he was ordered to be on vacation. He advised APD administration that he had been ordered on leave and assumed the CPT Wagner had knowledge of these duties. However, Jones had a disciplinary action which resulted in a letter of reprimand being placed in Jones' personnel file despite CPT Wagoner's order.  CPT Jones has seen other incidents of discrimination or harassment and been advised of same by other minority officers. He worked in APD as if stepping on egg shells, in fear of the least thing would trigger adverse actions. When he became the senior person on the promotion list for lieutenant and later to captain, he felt it was in his best interest and to persevere in his career not to provide the Caucasian APD administration any reason to prevent his advancement.  KING had letters of reprimand written and placed in CPT Jones file.  CPT Jones concluded KING was coming after him.  All of this made for a hostile work environment.

20.     Within the APD  African-American Officers were often subjected to racial slurs or descriptions along with racially charged incidents.  African-American officers, including the Plaintiff, have been called "Monkey Boy", "Trunk Monkey", "Lower Third

coon", and the term "Nigger" was used freely. A Puerto Rican officer was called a "spick".

21.    When African-American officers would call in sick, a Caucasian officer would come to the officer's home to confirm they were sick and at home. Caucasian officers were allowed to call in sick and use the time to deer hunt. A Caucasian Assistant Chief and Travis Lowe, a Caucasian officer,  belonged to the same deer lease. Lowe called in sick and went to the lease where the assistant chief hunted along with Lowe and no action was taken against Lowe. Martin Williams, an African-American officer, called in sick and was accused of traveling to New Orleans and eventually was forced to resign. Reggie Cooper called in sick and Sgt Edward Christie came to Cooper's residence to make sure he was sick. The same thing happened to LT Cedric Green and CPT Raymond Thomas seemingly as if the APD administration was looking for a reason to terminate African-American officers.

22.    Around 2001 or 2002 Officer Vincent Parker (now a Deputy with the Rapides Parish Sheriff's Office) was assigned to the Patrol Division, and after roll call went to retrieve his APD vehicle's keys. He was asked about purchasing plate lunches for an officer in need.  Parker asked what was in the lunches. SGT Donny Foster, a white Patrol supervisor said "I bet if it had fried chicken, gravy and rice, and watermelon, you would eat it." Parker abruptly left.  A week or two later SGT Foster put a watermelon in Parker's truck and told Parker he had put a gift in his truck. Both Parker and another

black officer, Edrick Coleman (SGT Foster called Coleman a "Lower Third Coon"), made complaints of racially derogatory terms, resulting in Foster's demotion. Foster appealed to the Civil Service board and the penalty was reduced.  A couple of Caucasian officers made comments in Parker's presence that "what goes around, comes around", which he interpreted as threats that he would be retaliated against. He resigned from APD and joined the RPSO in 2003.

23.     SGT Donny Foster referred to an African-American female officer as his "little chocolate bunny".  SGT Foster was demoted because another Caucasian officer heard of the incident and  reported it to the administration. The Caucasian shift LT, Darrel Baker, tried to keep the incident from going to the administration by asserting it was merely a joke, a rationale later used by TERRY.

24.     Juan Carlos Cruz, a Puerto Rican, joined the APD in 2003 and resigned in 2016 due the rampant racism in the department. He was insulted by a higher ranked officer, Farrell Gaspard, who twice called Cruz "spick" in front of other officers.  He complained of this to his SGT, Ronney Howard, and an investigation ensued. The APD administration advised his complaint was well founded and that disciplinary action had been taken against Gaspard, a suspension and a forfeiture of pay.  However, Cruz observed Gaspard coming to work everyday.  He inquired of a city accountant, who advised no pay had been deducted from Gaspard.  Believing Gaspard's seniority for promotion had not been affected by any suspension, and rather than face eventual

retaliation from Gaspard or his allies within the APD, Cruz resigned.  When Cedric Green was made Deputy Chief, Cruz observed an unknown officer had written "Trunk Monkey" on the board in the shift briefing room.

25.     KING manifested racial prejudice while he was a probationary sergeant assigned to the Alexandria Police Academy relating to an applicant, Tyrika Love - an African-American female, who had been recruited by Plaintiff. She made her initial application in 2017 with the APD as a police officer. KING advocated, due to Love's last name and the criminal history of some relatives, that she should not be considered for employment in law enforcement and/or should be screened at the academy more closely than other applicants. Plaintiff vigorously objected to KING's proposal as unfair and discriminatory, and threatened to report it to the APD administration and the City's H.R. Department. KING reacted angrily. Three applications to become an APD officer submitted by Tyrika Love were purposely misplaced and not acted upon. SGT Chris Cooper went on vacation and several applications for employment, including that of Tyrika Love, were found hidden under papers in his desk. She was finally admitted to the academy, and based on a refuted false accusation, was not allowed to enter the academy in January 2018. She reapplied and was admitted in July 2018, and was told she had failed a test and was terminated. She was allowed to work in APD dispatch until another academy commenced. She commenced the academy in 2019, then her grandfather died and she went to the funeral and returned to the firing range.

Purportedly a false allegation was made that she had threatened an instructor and she was expelled near the end of the Academy. Thereafter she gave up trying to join APD as an officer.

26.     While KING was assigned to the Academy, a incident transpired in which an African-American cadet officer from the Marksville Police Department was removed as a trainee from the academy due to his angry response when KING repeatedly called him a "Nigger", which KING asserted was part of training.

27.     All promotions in the APD are required by civil service law to be premised on scores on written civil service examinations, which once an officer passes, he is then placed on an eligibility list by seniority.  However, the scores originally were only valid for 18 months [was changed later to four (4) years].  African-American Officers had a history of failing the promotion exams. Most of the time the African-American officer would be told that they missed the test by one point. This continued until an African-American Lieutenant, (Frank Dawson, retired and now deceased) filed a grievance and proved that due to the scoring of the civil service promotion examination it was impossible to not pass by one point. All the African-American officers were allowed to retake the examination and Dawson was promoted to Captain.

28.     In 2016 the promotional examination was announced for Captain, Reginald Cooper and other senior African-American officers were eligible to be placed on the list for the written examination. Then TERRY was a Captain and told many he was not

going to retire, and then abruptly retired after Cooper's last test score was stale.  He asserted he was only "joking".  To keep Cooper and other African-American officers from applying for the written test, the APD administration changed without announcement how the examination date was posted. This was done only to keep senior African-American officers from applying to take the written examination.  LT Cooper and the other senior African-American officers filed a grievance to be allowed to take the examination.  They were allowed to take the examination because it was proven that the APD administration had deviated from prior practice in posting promotional exams.

29.     On December 23, 2017, SGT Glenn Hall, an African-American APD officer, participated in the "Shop with a Cop" program sponsored by the Office of the Marshal of the City Court of Alexandria, in response to an APD call for volunteers. The program facilitates disadvantaged children going shopping at Wal-Mart for Christmas while assisted by a uniformed officer. Several officers from various agencies participated. During the function at Wal-Mart, photographs were taken of the participants, one of which depicted SGT Hall hugging the young girl he was assisting at the cash register. Subsequently Ricky Rachal, the Interim City Marshal, campaigned to be elected as City Marshal and used that image of SGT Hall in his election advertisements, without obtaining SGT Hall's permission. A disciplinary investigation was initiated against SGT Hall by APD administration. He was polygraphed by Neil Carter, a polygrapher

commonly used by the APD, and purportedly was found to be deceptive on issue of whether he gave Marshal Rachal or his campaign permission to use the image. Despite Marshal Rachal having executed a notarized statement that he had not been given permission to use the image, SGT Hall was terminated on July 15, 2018 and appealed to the Alexandria Municipal Fire & Police Civil Service Board. Despite Marshal Rachal testifying during the appeal hearing that he had not obtained SGT Hall's permission to use the image in his campaign, SGT Hall's termination was upheld.

30.    On more than one occasion in October 2018, Sergeant Carla Whitstine, Officers Bobby Branton, Tanner Dryden, and Trevor Billington of the APD Detective Division Burglary Section visited the residence of Umika Young looking for her nephew and another young man, neither of whom resided with her. On one occasion Officer Branton asserted that Umika Young had had an outstanding warrant and took her into custody. When she was taken downtown for booking it was determined that Umika had no outstanding warrant and she was released. Officer Branton threatened to and had Umika's vehicle towed on December 12, 2018, and it remained in police storage as of March 23, 2020.

31.    Officers returned to her residence when Umika was not present and seized all the televisions and video game consoles within the residence. KING was captured on the body cam of Detective Bobby Branton saying "if it was my case, I would seize the

TVs" or words to that effect. Umika made complaints about this unlawful seizure to a supervisory officer.

32.     During one of the visits to the APD seeking the release of the televisions and game consoles, on February 1, 2019, Sergeant Carla Whitstine, Officers Bobby Branton, Tanner Dryden, and Trevor Billington falsely arrested Umika Young for the purported offense of Possession of Drug Paraphernalia (crack pipe). This was a fabricated charge, lodged in retaliation for Ms. Young's complaints. Criminal proceedings were initiated in the City Court of Alexandria (Criminal Number 192266) under her maiden name Umika O. Osteen, and she was arraigned and pled not guilty on April 9, 2019. After several trial settings, for which Umika had to appear in court, the prosecution, after viewing video recording and observing that Umika did not have a crack pipe, Nolle Prossed the charge on February 6, 2020.

33.     After the televisions and video game consoles had been seized, they were set up in the detective division and were being played with by officers. Officer Mechelle Williams, an African-American officer then assigned to the Juvenile Section of the detective division, complained to Chief Jerrod KING about this inappropriate behavior. No action was taken against the offending officers but Williams was transferred out of the Detective Division to Patrol Division.  Considering this to be a demotion in retaliation for her aforesaid complaint, she resigned from the APD and is now employed as a police officer with the Louisiana State University at Alexandria.

34.     KING initiated a disciplinary investigation of Officer Len Hall, the brother of Glenn Hall, on a speculative charge that Officer Hall had been having sex with someone inside a residence at which Officer Hall had parked his unit with a trainee inside. Chief KING ordered a polygraph examination. When Officer Hall was advised of the polygraph examination a short time (Caucasian officers were given days notice) before he was to take it, he demanded to speak to a union representative before signing an acknowledgment. When he went to the office of the union representative, he observed Chief KING, CPL Chris Cooper, and LT Vandyke meeting with the union representative. The Polygrapher told Officer Hall he had known of the ordered examination for weeks. Having seen how KING had stacked the deck against his brother, Officer Hall resigned from APD on September 6, 2018. After he resigned, KING obstructed Officer Hall's efforts to obtain employment with other law enforcement agencies, to the point of refusing to provide personal records to prospective employers without a court order. When Officer Hall applied with the Lafayette Parish Sheriff's Office, that agency had him polygraphed.  He denied lying to superiors at APD and his response had no deception indicated per the polygrapher.

35.     In 2019 KING met with the City Administration's Chief of Staff (Susan Broussard), the Commissioner of Public Safety (TERRY), and Pastor Randy Harris, then an assistant to Mayor Jeff Hall. During that meeting KING declared he would not pay a $300.00 fee to recruit African-American officers on the Grambling State University and

Southern University campuses, despite the quality of applicants that could be recruited there. KING argued heatedly with the Chief of Staff and advocated disregarding the federal consent decree. Broussard later opined that KING was narcissistic and out-of-control. TERRY took no corrective steps concerning KING's clear disrespect to the Chief of Staff.

36.    No African-American males were hired when KING was the Chief of Police. Currently African-American officers in the APD constitute 26% of the uniformed force, and according to the 2020 census African-Americans are 55.4% of the City of Alexandria population. Hence, no steps were taken by KING, TERRY, the APD, or the City administration to comply with the federal consent decree, but they appear intending to terminating African-American officers.

37.    In February of 2020, through civil service testing, Reginald Cooper was promoted to the rank of Assistant Chief. After that promotion KING kept him from performing the duties of Assistant Chief. All prior Assistant Chiefs, who were Caucasian, were allowed to perform the duties of the position with no obstruction or circumvention.  Assistant Chief Cooper was the first African-American Assistant Chief in the history of the APD. There were three other senior officers [Ronnie Howard, Cedric Green, and Plaintiff], African-Americans, that Chief KING similarly obstructed and circumvented. The only reason that they were not allowed to perform their assigned duties was due to their race.

38.      SGT Alton Horn, Jr., an African-American, has been employed by APD for 23 years and in 2020 was assigned to the Detective Division as supervisor of the Juvenile Section. The Burglary and Homicide Sections of the Detective Division were composed solely of Caucasian officers and the Juvenile Section was composed solely of African-American officers.  CPT Darrell Jones, an African-American, was the head of the entire Detective Division and LT Kenneth Rachal, a Caucasian, was the assistant supervisor.  LT Rachal primarily associated with the Caucasian officers of the Burglary Section [Carla Whitstine, Bobby Branton, Rodney]. After COVID19 protocols where implemented, SGT Horn, SGT Whitstine and CPT Jones stayed home due to pre-existing conditions. On April 12, 2020, SGT Horn observed LT Rachal and Officer Branton drive by Horn's residence.  Horn called Rachal's cellular telephone and learned Rachal had driven purposefully past his residence to check on whether Horn was "faking it".  SGT Horn challenged LT Rachal about only associating with the Caucasian officers of the Burglary Section.  LT Rachal responded "What more do you want? You already have a black Captain leading the Detective Division!"

39.      Vehicles in the APD were customarily assigned by seniority within the Detective Division, newer vehicles being offered to the next senior officer.  A newer vehicle became available and LT Rachal assigned it to a Caucasian sergeant with less seniority than SGT Horn.  SGT Horn complained to LT Rachal about not offering the vehicle to Horn first.  Subsequently LT Rachal was terminated for using a racial slur against an

African-American officer.  SGT Horn believes the APD is and has been a hostile work environment due to long term rampant and pervasive racism and prejudice.

40.     In early 2020 after COVID19 protocols were implemented by APD, a number of officers with pre-existing conditions were sent home. King wanted CPT Darrell Jones to counsel LT Darrell Clark on not returning to duty after the COVID19 protocols were terminated, but CPT Jones advised he wasn't aware that LT Clark and the Narcotics detectives had not returned to duty. CPT Jones had seen LT Clark and thought everyone in Narcotics was back at work. CPT Jones had been out due to COVID19 protocols for a month and LT Kenneth Rachel was performing duties as a the assistant commander and CPT Jones thought LT Clark was back on schedule after speaking to him every morning at roll call. During the COVID19 protocols CPT Jones was ordered to work from home due to his medical condition and concern about the pandemic. While working from home on a daily basis, CPT Jones  attended the Detective Division roll call by telephone, and each Monday morning attended the staff meeting in the same manner. CPT Jones thought it inappropriate to counsel  LT Clark since he thought everyone knew to return to duty when Jones was called and advised by LT Rachal.  LT Clark advised CPT Clark that neither LT Rachal nor anyone else  called Clark to inform of the changes. However, the problem was immediately corrected and the following day the Narcotics Section was back on normal schedule.  KING verbally counseled CPT Jones on an incident and instructed Jones to write an explanation, which he did. The next day

Chief Cooper came to CPT Jones' office and advised him that he had been ordered by King to counsel Jones based upon the letter CPT Jones submitted.  During this period CPT Jones sensed heighten racial tensions and felt that African American senior officers, including himself, were at risk. In thirty plus years CPT Jones had never received any reprimand until under the KING administration.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Racial Discrimination - Title VII & 42 U.S.C. § 1981

41.    Plaintiff hereby re-adopts and re-alleges paragraphs one (1) through forty (40) above as if fully set forth herein.

42.    Plaintiff has been discriminated against on the basis of his race in violation of the Civil Rights Act and in violation of § 1981 in pay, promotion, demotion, discipline, constructive discharge, and other terms and conditions of his employment.

43.    As a result of Defendant CITY OF ALEXANDRIA's discrimination, Plaintiff has suffered damages.

44.    Plaintiff is entitled to recover, and hereby seeks, said damages, including back pay, front pay, retirement, benefits, compensatory damages for emotional distress and/or mental anguish, reinstatement, injunctive and declaratory relief, attorneys fees and costs, punitive damages, and other damages.

## SECOND CLAIM FOR RELIEF

## Retaliation against a Witness, Victim or Informant - 18 U.S.C. § 1513

45.    Plaintiff re-adopts and re-alleges paragraphs one (1) through forty-four (44) above as if fully set forth herein.

46.    Plaintiff has been retaliated against due to his disclosing, along with several other officers of the Alexandria Police Department, to an FBI agent (SA Jeff Goins), a civil rights violation ("excessive force") involving a firearm committed by a senior white APD officer [LT Kenneth Rachal] upon an African-American suspect [Daquarious Deshawn Brown] and captured on LT Rachal's body camera.

47.    As a result of Defendants CITY OF ALEXANDRIA, DARYL TERRY and JERROD D. KING's retaliation, Plaintiff has suffered damages.

48.    Plaintiff is entitled to recover, and hereby seeks, said damages, including back pay, front pay, benefits, compensatory damages for emotional distress and/or mental anguish, reinstatement, injunctive and declaratory relief, attorneys fees and costs, punitive damages, and other damages.

## THIRD CLAIM FOR RELIEF

## Louisiana Whistleblower Claim (LA R.S. § 23:967)

49.    Plaintiff re-adopts and re-alleges paragraphs one (1) through forty-eight (48) above as if fully set forth herein.

50.     Defendants violated the law through various workplace acts and/or practices.

51.     Plaintiff in good faith advised the City of Alexandria of said workplace practices.

52.     Plaintiff objected to and/or refused to participate or acquiesce in said violations of the law.

53.     Defendants discharged Plaintiff as a result of his refusal to participate in by acquiescence and reported or objection to said violations.

54.     As a result of Defendants' termination of his employment, Plaintiff has suffered damages.  Plaintiff is entitled to recover, and hereby seeks, said damages, including back pay, emotional distress and/or mental anguish, lost benefits, attorney's fees and costs, and other damages.

## **PRAYER FOR RELIEF**

55.     Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

a.     Compensatory and consequential damages, including damages for back pay, front pay, benefits, compensatory damages for emotional distress and/or mental anguish, reinstatement, injunctive and declaratory relief, punitive damages, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

b.     Economic losses on all claims allowed by law;

c.      Special damages in an amount to be determined at trial;

d.      Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

e.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

f.      Pre- and post-judgment interest at the lawful rate; and,

g.      Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

PLAINTIFF REQUESTS A TRIAL BY JURY.

Dated:   **December 7, 2020**                    Respectfully Submitted,

                                        By: */s/Brett L. Grayson*
                                        BRETT L. GRAYSON, (#06268)
                                        850 Kaliste Saloom Rd., Suite 120
                                        Lafayette, Louisiana 70508-4230
                                        Telephone: (337) 706-7646
                                        Facsimile: (337) 706-7648
                                        Email: brett.grayson@blgraysonesq.com
                                        ATTORNEY FOR DARRELL CLARK