## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **DARRELL EUGENE CLARK, ET AL** | **CIVIL DOCKET NO. 1:20-CV-01581** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **CITY OF ALEXANDRIA, ET AL** | **MAGISTRATE JUDGE JOSEPH H.L. PEREZ-MONTES** |

### MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") filed by Defendants City of Alexandria (the "City"), Jerrod D. King ("Chief King"), Daryl Louis Terry ("Terry"), Patrick Ramon Vandyke ("Vandyke"), and Christopher Louis Cooper ("Cooper") (collectively, "Defendants").  [Doc. 100].  Defendants seek summary judgment as to every claim asserted by Plaintiffs Darrell Eugene Clark ("Clark"), Reginald David Cooper ("Cooper"), Markiz Marta Hood ("Hood"), Cedric Linbert Green ("Green"), and Tyrika Trenea Love ("Love") (collectively, "Plaintiffs").  After careful consideration, and for the reasons set forth below, the Court GRANTS Defendants' Motion.

### BACKGROUND

Plaintiffs are two former employees, one current employee, and one unsuccessful applicant for employment with the Alexandria Police Department ("APD").  Their claims arise from allegedly racially discriminatory acts in connection with their employment, or desired employment, with the APD.  *See* [Doc. 89, ¶ 1] (where, in their Third Amended Complaint, Plaintiffs claim that the APD has "historically and continues to engage in a department-wide pattern and practice of

employment discrimination, both intentional and systemic, on the basis of race"). Chief King was the Chief of the APD during much of this time, and many of Plaintiffs' claims stem from his alleged behavior in the capacity as their supervisor. *Id.* at ¶ 14. (Chief King was "at all times [] herein the [] Chief of the APD, and … [therefore] the policy maker for the APD"); *see also id.* at ¶ 13 (noting that Daryl Louis Terry was the "Commissioner of Public Safety for the City and … [therefore] the direct supervisor of [Chief] King").

Plaintiffs filed suit in this matter on December 7, 2020, invoking this Court's federal question jurisdiction. *See* [Doc. 1, ¶ 1] (citing 28 U.S.C. §§ 1331, 1367). In their Third Amended Complaint (the "Complaint"), Plaintiffs assert the following claims:

(i)     Clark, Cooper, Green, and Hood assert numerous, distinct racial discrimination claims against the Defendants pursuant to 42 U.S.C. §§ 2000e, et seq. ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1981 ("Section 1981"), the Louisiana Human Rights Act, La. R.S. § 51:2231, (the "LHRA"), and the Louisiana Employment Discrimination Law La. R.S. § 23:332 (the "LEDL"), [Doc. 89, ¶¶ 31–80, 102–04];

(ii)    Clark, Cooper, and Green assert retaliation claims against the City, Terry, and Chief King, pursuant to Section 1983 and the First and Fourteenth Amendments, *id.* at ¶¶ 81–90; and

(iii)   Clark, Cooper, and Green assert eavesdropping claims under the Wiretap Act, 18 U.S.C. § 2511, *id.* at 91–95.

*See generally* [Doc. 89].[1]

Defendants filed the instant Motion on May 25, 2023, asking the Court to "grant a summary judgment dismissal with prejudice as to all [of Plaintiffs'] claims"

---

[1]     In addition to Clark, Cooper, Green, and Hood, Plaintiffs' Complaint lists three other APD officers as parties to this lawsuit. *See* [Doc. 89, ¶¶ 8–10]. The Court has, however,

because those claims lack both "legal [and] evidentiary support[.]"  Plaintiffs filed an Opposition on July 11, 2023, to which Defendants have filed a Reply.  *See* [Docs. 107, 110].  The Motion is now ripe for ruling.

## LAW AND ANALYSIS

## I.   **Summary Judgment Standard**

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party."  *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The party moving for summary judgment bears the burden of

---

already dismissed the claims of two of these Plaintiffs in a prior Order, and the merits of their allegations will not be reconsidered here.  *See generally* [Doc. 88] (adopting the Magistrate Judge's Report and Recommendation, [Doc. 76], and dismissing the claims brought by Glenn Hall and Alton James Horn).

Relatedly, Plaintiffs' Opposition "concedes dismissal" with respect to both: (i) every claim asserted by Love; (ii) Hood's Title VII claims; and (iii) every claim asserted against Vandyke and Cooper individually.  *See* [Doc. 107, pp. 10, 78].  Summary judgment is thus appropriate as to these claims.

Finally, Chief King and Terry have asserted qualified immunity with respect to the claims levied against them individually.  *See generally* [Doc. 100-1].  Although a "good-faith assertion of qualified immunity" means the plaintiff bears the burden of establishing its inapplicability, Plaintiffs' Opposition does not address the applicability of this defense.  *See generally* [Doc. 107]; *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016).  Accordingly, summary judgment is appropriate as to the claims asserted against Chief King and Terry individually.

demonstrating that there is no genuine issue of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery.  *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  If the movant fails to meet this burden, the court must deny the moving party's motion for summary judgment.  *Id.*

If the movant satisfies its burden, however, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* (citing *Celotex*, 477 U.S. at 323).  In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no genuine issue for trial – and a grant of summary judgment is warranted – when the record as a whole "could not lead a rational trier of fact to find for the non-moving party[.]"  *Id.*

## II.   **Race Discrimination**

### A.  **Discriminatory Termination & Demotion**

Title VII, Section 1981, and the LEDL prohibit racial discrimination in the context of one's employment.  *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) ("We consider racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981 under the same rubric of analysis.") (cleaned up); *see also Bradford v. Jackson Par. Police Jury,* 2019 WL 7139499, at *4 (W.D. La. Dec. 20, 2019) ("Claims under the LEDL are 'essentially identical, analytically, to Title VII.'") (citing *Bustamento v. Tucker,* 607 So.2d 532, 538 n. 6 (La. 1992)).  A plaintiff lacking

direct evidence[2] of racial discrimination must satisfy the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny. *Bradford*, 2019 WL 7139499, at *4.

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* claim of racial discrimination. *Hardison v. Skinner,* 2022 WL 2668514, at *2 (5th Cir. July 11, 2022)); *see also Whatley v. Hopewell,* 2022 WL 11385995, at * (W.D. La. Oct. 19, 2022) (noting that "[o]nce the plaintiff carries their *prima facie* burden, the employer is presumed to have retaliated against the plaintiff."). The burden then shifts to the employer to produce evidence that the complained-of conduct was the result of a "legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (noting that the defendant's burden "is one of production, not persuasion" and "can involve no credibility assessment.") (cleaned up). If the defendant produces evidence of a nondiscriminatory reason for the employment action, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but is instead a pretext for … [a discriminatory] purpose." *Hardison*, 2022 WL 2668514, at *2 ("To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.").

The elements of a plaintiff's *prima facie* case vary with the nature of the claim asserted. *Compare Morris v. Town of Indep.*, 827 F.3d 396, 400–01 (5th Cir. 2016)

---

[2]     "Direct evidence is evidence which, if believed, proves the fact of intentional discrimination without inference or presumption." *Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993).

(discriminatory termination) *with Alvarado v. Texas Rangers*, 492 F.3d 605, 610–11 (5th Cir. 2007) (failure-to-promote) *and McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir.2007) (Title VII retaliation).  With respect to claims of discriminatory termination or failure-to promote, a plaintiff can make a *prima facie* showing of race discrimination by establishing that: (i) he is a member of a protected group; (ii) he was qualified for the position held; (iii) he suffered some adverse employment action (*i.e.*, discharged or demoted) by their employer; and (iv) he was either replaced by someone outside his protected group or was treated less favorably than similarly situated employees outside the protected group.  *Johnson v. Iberia Med. Ctr. Found.*, 2023 WL 1090167, at *9 (W.D. La. Jan. 27, 2023).

A plaintiff may carry the fourth element of their *prima facie* discrimination claim by "point[ing] to a comparator who was similarly situated" but was "treated more favorably than the plaintiff under nearly identical circumstances." *Ernst v. Methodist Hosp. Sys.,* 1 F.4th 333, 340 (5th Cir. 2021) (citing *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 410 (5th Cir. 2016)).  As between the plaintiff and the comparator, "nearly identical circumstances" exist when: (i) both employees have the same job responsibilities; (ii) both employees have "essentially comparable violation histories;" and (iii) both employees either shared the same supervisor or had their employment status determined by the same person.  *Hardison v. Skinner,* 2022 WL 2668514, at *3 (5th Cir. July 11, 2022).  Critically, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the

proffered comparator who allegedly drew dissimilar employment decisions." *Id.* (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)).

In this case, Clark, Cooper, and Green each broadly claim that "the APD[] has long implemented and followed a policy of discrimination in … disciplining police officer employees … on the basis of race" in violation of Title VII, Section 1981 and the LEDL. [Doc. 107, pp. 46, 55, 75]. The claims of Clark and Cooper relate to their respective terminations in 2020, while Green's claims stem from his demotion in February 2021. The Court addresses each claim in turn.

### i.   <u>Clark's Termination</u>

Mr. Clark spent 28 years as an APD officer. [Doc. 89, p. 4]. His tenure with the APD ended on June 25, 2020, when he was discharged for "clearly r[unning] afoul of and violat[ing] well-established civil service rules and City policies[.]" *See* [Doc. 100-13, p. 8]. More specifically, Clark's termination letter states that his discharge was precipitated by Clark's misuse of APD's National Crime Information Center ("NCIC") database, Thinkstream, to run criminal background checks on other APD employees and private individuals for personal reasons.[3] *Id.* at pp. 4–8 (explaining

---

[3]     As described by another Court, NCIC is a "nationwide computerized information system maintained by the [FBI] [that] contains criminal background information on individuals residing in the United States." *See United States v. Painter,* 2013 WL 609755, at *1 (M.D. La. Nov. 20, 2013).

According to both Clark's termination letter and his own deposition testimony, Clark used Thinkstream to conduct searches on at least 15 individuals for reasons unrelated to his duties as an APD officer.  *See* [Doc. 100-13, p. 4] (noting that three of those individuals were employees of the APD at the time of Clark's search); *see also* [Doc. 100-9, pp. 94, 96, 101, 110, 120] (where Clark admits to running searches on his wife, his wife's suspected lover, his former sister-in-law, his daughter, and his former girlfriend); [Doc. 100-12, pp. 30, 55] (where Clark admits to running searches on both his ex-wife and Chief King).

that Clark's conduct violated La. R.S. 15:596(B), as well as numerous APD rules and regulations).

Here, Defendants claim that Clark is unable to meet the fourth element of his *prima facie* case, *i.e.,* that he was either replaced by someone outside his protected group or was treated less favorably than similarly situated employees outside the protected group.  As noted above, a plaintiff may carry the fourth element of their *prima facie* discrimination claim by "point[ing] to a comparator who was similarly situated" but was "treated more favorably than the plaintiff under nearly identical circumstances."  *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 340 (5th Cir. 2021). Defendants' Motion argues that because he lacks an adequate comparator, Clark cannot establish his *prima facie* case of race discrimination.  [Doc. 100-1, p. 35]. Clark, in turn, offers Corporal Clifton Fairbanks ("Corporal Fairbanks"), a white APD officer, as a comparator.[4]

According to an affidavit submitted by Clark, "[Mr.] Fairbanks, a white male, was verbally reprimanded for the misuse of the NCIC Think Screen [sic] Information

---

[4]     In addition to Corporal Fairbanks, Clark has proffered numerous other white APD officers as comparators in support of his contention that black officers "were disciplined more often or more severely for minor infractions than Caucasian officers, even when the white officers committed criminal offenses."  *See* [Doc. 107, pp. 23–29] (discussing the way in which the APD disciplined several white officers who – among other things – totaled a police vehicle, falsified an incident report, made "racially charged statements", and violated departmental sick leave policy).  However, with the exception of Corporal Fairbanks, these officers are not valid comparators because they have not engaged in conduct "nearly identical" to the conduct that precipitated Clark's discharge.  *See Hardison v. Skinner,* 2022 WL 2668514, at *3 (5th Cir. July 11, 2022) ("[C]ritically, the plaintiff's *conduct* that drew the adverse employment decision must have been 'nearly identical' *to that of the proffered comparator* who allegedly drew dissimilar employment decisions.") (emphasis in original); *but see Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 260 (5th Cir. 2009) ("We do not … interpret 'nearly identical' as

System for searching vehicles' license plates and the names of persons whom he believed to be associated with or dating his ex-girlfriend." [Doc. 107-2, p. 13]. But it is undisputed that (i) Corporal Fairbanks and Clark had different immediate supervisors; (ii) Clifton Fairbanks held the position of Corporal, two ranks lower than Clark, a Lieutenant; and (iii) Corporal Fairbanks worked Street Patrol while Clark commanded APD's Narcotics Division. *See* [Doc. 100-1, p. 35]; [Doc. 107, p. 29]. All told, given the drastic differences in their positional status, Clark and Corporal Fairbanks are not "similarly situated." *See Saketkoo v. Administrators of Tulane Educ. Fund,* 31 F.4th 990, 999 (5th Cir. 2022) (plaintiff's proffered comparators are inadequate in part because they held "disparate job titles and presumably different responsibilities"); *accord*, *Ernst v. Methodist Hosp. System*, 1 F.4th 333, 340 (5th Cir. 2021); *Hinga v. MIC Grp., L.L.C.*, 609 F. App'x 823, 827 (5th Cir. 2015) ("First, and most critical, [the plaintiff and their proffered comparators] did not have the same job responsibilities."). Because Clark cannot establish that he was "treated less

---

synonymous with 'identical' … [T]he similitude of employee violations may [instead] turn on the 'comparable seriousness' of the offenses for which discipline was meted out[.]").

In any event, Clark has not produced evidence that these officers shared his job responsibilities or possessed "essentially comparable violation histories." *See* [Doc. 107, pp. 22–29] (vaguely describing Clark's proffered comparators); *see also Lee*, 574 F.3d at 260 ("[N]early identical circumstances [exist] when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, *and* have essentially comparable violation histories.") (emphasis added). Accordingly, these would-be comparators do not support the fourth element of Clark's *prima facie* discrimination claim.

favorably than *similarly situated* employees outside the protected group," summary judgment is appropriate as to his race discrimination claim.[5]

### ii.   Cooper's Termination

Prior to his termination, Cooper spent more than 30 years as an APD officer – attaining the rank of Assistant Chief.  [Doc. 49-5, p. 4].  Mr. Cooper's tenure at the APD ended on July 20, 2020, when he was discharged for: (i) failing a polygraph conducted during an Internal Affairs investigation; and (ii) "conducting an unauthorized investigation into an[other] APD officer."  [Doc. 100-27, p. 4] (Cooper's termination letter).   Cooper's termination was later upheld by the Alexandria Municipal Fire & Police Civil Service Board on appeal.  [Doc. 107, p. 30].

Mr. Cooper does not dispute the facts precipitating his discharge, but rather claims it was wrongfully motivated.[6]  *See* [Doc. 107, p. 59].  But critical to his claim

---

[5]      Although a plaintiff may also establish the fourth element of their *prima facie* race discrimination claim by showing that "they were [] replaced by someone outside her protected group," *see Johnson v. Iberia Med. Ctr. Found.,* 2023 WL 1090167, at *9 (W.D. La. Jan. 27, 2023), it is undisputed that Clark's previous position no longer exists within the APD.  *See* [Doc. 107, p. 51] (where Plaintiffs claim that the APD's Narcotics Division was apparently "combine[d] with the Rapides Parish Sheriff Department's Narcotics Division and other surrounding agencies, possibly creating a joint task force.").

[6]      In 2019, an APD officer was accused of "us[ing] excessive force while effecting [the] arrest" of Daquarious Brown.  *See Brown v. City of Alexandria,* 2022 WL 2873666, at *1 (W.D. La. July 21, 2022) (the Section 1983 lawsuit arising from this event).  According to statements he provided to the APD, Cooper believed that this APD officer had also: (i) effected a traffic stop in 1999 that resulted in an additional civil rights violation against another individual, Chris Wilder; and (ii) that the officer was also involved in an unidentified "homicide in Alexandria that was never solved."  [Doc. 100-21, p. 12]; *see also* [Doc. 107, p. 59].  Apparently concerned about this officer's conduct, Cooper – unsolicited and in plainclothes – approached the house of Chris Wilder's mother in an attempt to "find out what [he] could" about the APD officer sometime prior to his discharge.  [Doc. 100-25, p. 87].

After discovering Cooper's contact with Chris Wilder's mother, the APD initiated an Internal Affairs investigation that included several pre-disciplinary interviews, one of which included the use of a polygraph.  *See* [Doc. 100-22].  Cooper's polygraph results indicated that he

here, Plaintiffs' Opposition neither argues nor provides evidence that Cooper was either "replaced outside [his] protected group" or "treated less favorably than similarly situated employees outside the protected group."[7]   *See* [Doc. 107, p. 55] (claiming – without explanation – that "Mr. Cooper's Affidavit testimony shows that he was, in fact, the subject of discrimination" as a part of his termination); *see also* [Doc. 49-5] (Cooper's affidavit, which does not identify an adequate comparator or otherwise suggest that his termination was racially motivated); *Brew v. Weyerhaeuser NR Co.,* 537 Fed. App'x 309, 313 (5th Cir. 2013) (dismissal proper where the plaintiff "does not allege, much less show [] that any of [his proffered comparators] was similarly situated."). Because Cooper cannot establish the fourth element of his

---

answered three separate questions untruthfully. *See generally id.* (the report written by Cecil Carter, the administrator of Cooper's polygraph); *see also* [Doc. 100-23] (the report written by Nathan Gordon, an independent polygraph examiner who corroborated the conclusions reached by Cecil Carter).

[7]      It is undisputed that, after his termination, Cooper was replaced with a black woman. *See* [Doc. 100-1, p. 70]; [Doc. 107, p. 55].

Additionally, Plaintiffs' Opposition makes a passing reference to Sergeant Mark Tigner, a white APD officer who allegedly "ma[de] false statements to the Louisiana State Police in reference to submitting … false [NCIC] recertification test scores of APD officers for several years." [Doc. 107, p. 29]. Aside from being different ranks – Cooper was then the Assistant Chief – there is no indication that Sergeant Tigner "released [] APD information to persons not employed with the APD" or "conduct[ed] an unauthorized investigation into an[other] APD officer." For these reasons, Sergeant Tigner is an inadequate comparator for purposes of Cooper's *prima facie* claim.

*prima facie* case, summary judgment is appropriate as to his claim of racially discriminatory termination.

### iii.   Green's Demotion

Finally, much like Cooper, Green was employed for more than 30 years with the APD.  [Doc. 107-5, pp. 1, 14].  Although Green is still an APD officer, on February 26, 2021, he was demoted from the position of Lieutenant to Sergeant.  [Doc. 100-1, p. 84]; *see also* [Doc. 107, pp. 30–31] (where Plaintiffs note that "[u]pon appeal to the Alexandria Municipal Fire & Police Civil Service Board, his demotion was upheld.").  Mr. Green's disciplinary letter explains that he was demoted for two reasons:

(i)    As noted above, Cooper unsuccessfully appealed his termination to the Alexandria Municipal Fire and Police Civil Service Board.  [Doc. 107, p. 30].  Sometime in late 2020, without authorization from the APD, Green provided an "employment list" to Cooper for use in his Civil Service appeal.  [Doc. 100-32, p. 1].  This document – which contained the home address and phone number of every officer then-employed by the APD – was later used by Plaintiffs' counsel in connection with Cooper's appeal.  *Id.*

(ii)   When he was later questioned during an Internal Affairs investigation, Green stated repeatedly that he did not know how Plaintiffs' counsel gained possession of this document.  *See* [Doc. 100-32, pp. 15–22] (where Green insists he has "no idea" how the employment list became a part of Cooper's Civil Service appeal).  During a subsequent interview – which apparently included the use of a polygraph – Green repudiated his prior statements and admitted that he did in fact provide the employment list to Cooper.  [Doc. 100-37, pp. 12–15, 23].

Plaintiffs' Opposition indicates that the facts giving rise to Green's demotion are undisputed.  *See* [Doc. 107, pp. 66–70].  Nevertheless, Plaintiffs maintain that "[d]isputes in material fact concerning whether [Mr. Green] was demoted due to discriminatory reasons prelude summary judgment with respect to this claim."  *Id.*  However, much like Cooper, Green has not provided evidence indicating that he was

"replaced outside [his] protected group" or was "treated less favorably than similarly situated employees outside the protected group" with respect to his demotion.[8]  *See generally id.*  Accordingly, because Green cannot establish the fourth element of his *prima facie* case, summary judgment is appropriate as to his racially discriminatory demotion claim.

### B. Hood's Failure-to-Hire Claim

One plaintiff, Hood, claims that he was the subject of racial discrimination in APD's refusal to hire him as an officer.  A plaintiff asserting a failure-to-hire claim must establish that: (i) he is a member of a protected class; (ii) he applied and was qualified for an open position; (iii) despite his qualifications, he was not selected for the position; and (iv) after his rejection, the position stayed open, and the employer continued to seek applicants with the plaintiff's qualifications.  *Johnson v. Maestri-Murrell Prop. Mgmt.*, LLC, 487 F. App'x 134, 138 (5th Cir. 2012).  The burden then shifts to the defendant to "produce evidence that [their] … [hiring] decision was made for a 'legitimate, non-discriminatory reason.'"  *Id.*  Finally, the plaintiff must prove "intentional discrimination [using] evidence that the [] reason offered by the defendant was not the true reason but was [rather] a pretext for discrimination."  *Id.* (citing *Reeves v. Sanderson Plumbing Prods.*, Inc. 530 U.S. 133, 142–43 (2000)).

According to his affidavit, despite passing the Civil Service Examination, Hood unsuccessfully applied for a position with the APD three times.  [Doc. 107-6, p. 2].

---

[8]    It is undisputed that, following his demotion, Green was replaced with a black man. *See* [Doc. 100-1, p. 88]; [Doc. 107, p. 67].

Mr. Hood claims that, following his most recent application in 2018, he was "orally advised [] that [he] was cleared to work for the APD" by the clinical psychologist who administered his mental health evaluation." *Id.* However, when the APD contacted Hood on January 2, 2019, he was informed that he had in fact failed the APD's mental health evaluation and would therefore not be hired. *Id.*; [Doc. 100-1, p. 103]; [Doc. 107, p. 79].

Despite submitting his application in 2018, Hood did not seek to be added as a plaintiff in this lawsuit until July 7, 2021. *Compare* [Doc. 1] *with* [Doc. 11]. Both LEDL claims and failure-to-hire claims arising under Section 1981[9] are subject to a one-year prescriptive period and, as noted above, Hood "concedes that summary judgment is appropriate with respect to his Title VII claim." *See* [Doc. 107, p. 78]; *Mitchell v. Crescent River Port Pilots Ass'n,* 265 F. App'x 363, 368 (5th Cir. 2008)

---

[9]      Section 1981 does not contain a statute of limitations. *See generally* 42 U.S.C. § 1981. When a federal cause of action lacks a statute of limitations, courts typically apply "the most appropriate or analogous state statute of limitations" which, here, would be Louisiana's one-year prescriptive period. *See Belton v. Geo Grp., Inc.,* 2021 WL 926197, at *3 (W.D. La. Mar. 10, 2021)*, aff'd,* 21-30144, 2021 WL 5832953 (5th Cir. Dec. 8, 2021) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004) and La. C.C. art. 3492). When, however, a cause of action "aris[es] under federal statutes [that were] enacted after December 1, 1990, courts must apply [the] catchall four-year statute of limitations" provided in 28 U.S.C. § 1658. *Belton,* 2021 WL 926197, at *3.

As this Court has previously explained, "Section 1981 was originally enacted as part of the Civil Rights Act of 1866 and [in its original form] covered 'only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process.'" *Id.* at *4 (citing *Culbert v. Cleco Corp.,* 926 F.Supp.2d 886, 891 (W.D. La. 2013) and noting that "Section 1981 was later amended by the Civil Rights Act of 1991 to create a cause of action for discriminatory and retaliatory conduct occurring after the formation of the contract."). Here, because Hood's failure-to-hire claim relates to "conduct at the initial formation of [his employment] contract" rather than "conduct occurring after the formation of [his employment] contract," Hood's claim is governed by the one-year prescriptive period imposed by La. C.C. art. 3492.

(with respect to discrete claims of discrimination under Section 1981, federal courts must "borrow the analogous state tort statute of limitations, which [here] is Louisiana's one-year prescriptive period."); La. R.S. § 23:303 ("Any cause of action provided in this Chapter shall be subject to a prescriptive period of one year.").  Mr. Hood's failure-to-hire claim is thus time-barred under both Louisiana and federal law, and summary judgment is therefore appropriate with respect to that cause of action.[10]

## C. <u>Hostile Work Environment</u>

Title VII, Section 1981, and the LEDL prohibit the creation of a hostile or abusive work environment.  *Lauderdale v. Texas Dep't of Crim. Just., Institutional*

---

[10]     Although he was never hired by the APD, Plaintiffs' Opposition indicates that Hood is "currently employed full-time as a Lake Charles Police Department Patrol Officer [as of] August 1, 2022."  [Doc. 107, pp. 78–80].  Hood insists that the prescriptive period for his LEDL and Section 1981 claims did not begin to run until "he underwent, and passed, the [] psychological evaluation administered … in July 2022, when he applied for employment at the Lake Charles Police Department."  This position is both legally and factually meritless.

First, Hood cites no authority in support of his argument that prescription commenced when he was later hired by Lake Charles.  Nor is the law unclear on this point.  *See id.*; *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110–11 (2002) (explaining in the Title VII context that a "discrete … discriminatory act" – such as a refusal to hire an individual of their race – "occurred on t*he day that it happened*.") (internal quotations omitted) (emphasis added); *see also Mitchell v. Crescent River Port Pilots Ass'n,* 515 F. Supp. 2d 666, 676 (E.D. La.2007), *aff'd,* 265 F. App'x 363 (5th Cir.2008) (noting that both the Fifth Circuit and other circuit courts have invariably applied the Supreme Court's decision in *Morgan* to claims arising under Section 1981); *Clark v. City of Alexandria*, 2022 WL 18144872, at *4 (W.D. La. Dec. 9, 2022), *report and recommendation adopted*, 2023 WL 122971 (W.D. La. Jan. 6, 2023) ("The prescriptive period for discrete acts begins to run on the day the act occurred … [and] [b]ecause Hall's … claims relating to his termination were filed more than one year after his termination, they are untimely."); *Mayes v. Office Depot, Inc.,* 292 F. Supp. 2d 878, 888 (W.D. La.2003) ("A one-time employment event, *including the failure to hire*, is 'the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued.'") (emphasis added).

Further, even assuming his claim was timely, the only evidence of Hood's mental fitness is the mental health evaluation he completed as part of his 2018 application.  *See* [Doc. 98].

*Div.*, 512 F.3d 157, 162 (5th Cir. 2007) (citing 42 U.S.C. § 2000e–2(a)(1)); *Williams v. E.I. du Pont de Nemours & Co.*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015) ("Courts analyze employment discrimination claims brought under Section 1981, including hostile work environment and retaliation claims, under the same standards applicable to Title VII claims.") (internal quotations omitted); *Robinson v. Healthworks Int'l, L.L.C.*, 36,802, p. 6 (La. App. 2 Cir. 1/29/03); 837 So.2d 714, 719, w*rit not considered sub nom.  Robinson v. Health Works Int'l, L.L.C.*, 2003-0965 (La. 5/16/03); 843 So.2d 1120 (discussing the LEDL); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 106 (2002) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'").

To survive summary judgment on a hostile work environment claim, an employee must establish that: (i) the employee belongs to a protected class; (ii) the employee suffered harassment affecting a "term, condition, or privilege" of their employment; (iii) the harassment was unwelcome; and (iv) the harassment was based on the employee's status as a member of a protected class. *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022).  Critically, for harassment to affect

---

Plaintiffs' Opposition does not produce any evidence that this evaluation was administered incorrectly or in a discriminatory manner.  *See* [Doc. 107, pp. 80–81].  Moreover – and notwithstanding Hood's arguments to the contrary – the fact that Hood subsequently passed the Lake Charles Police Department's mental health evaluation in 2022 has limited relevance to his mental fitness *in 2018*, the year in which he applied for a position with the APD.  *See id.* (concluding that "Mr. Hood's Affidavit testimony shows that he was, in fact, qualified as evidenced by his other employment opportunities.").  Because there is nothing in the record indicating that Hood was mentally fit at the time of his 2018 application, Hood cannot show that he was qualified for a position as an APD officer, which necessarily means he cannot establish an essential element of his *prima facie* failure-to-hire claim.

a "term, condition, or privilege" of employment, the conduct at issue must be "sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment."[11]   *Wantou*, 23 F.4th at 433 (emphasis added).

### i. **Clark's Claims**

Clark alleges that on several occasions, Chief King "embarrassed and intimidated Mr. Clark" by engaging in conduct that "[was] sufficiently severe or pervasive to alter the conditions of Mr. Clark's employment." [Doc. 107, p. 45].  Mr. Clark describes these incidents as follows:

(i)     On an unspecified date, a white APD officer allegedly "call[ed] [a black APD officer] 'Monkey Boy' while on duty in a public venue." [Doc. 107-2, p. 3] (Clark's affidavit).

(ii)    On an unspecified date, a white APD officer allegedly "made statements that could be considered racially offensive" while speaking with a black APD officer.  *Id.* at p. 9.

(iii)   On an unspecified date, after Mr. Clark "questioned how Chief King [] screen[ed] an African American Applicant", Chief King allegedly responded by saying that "his entire staff would soon be

---

[11]   In determining the "severity or pervasiveness" of sexual harassment, courts typically consider: (i) the frequency of the conduct; (ii) the conduct's severity; (iii) whether the conduct is physically threatening or humiliating; and (iv) whether the conduct "unreasonably interferes with an employee's work performance."  *Wantou*, 23 F.4th at 433 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  This is a totality of the circumstances inquiry; no single factor is dispositive.  *Id.*

Additionally, harassment must be either severe or pervasive; it need not be both.  *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) ("[I]solated incidents, if egregious, can alter the terms and conditions of employment."); *see also Herster v. Bd. of Supervisors of Louisiana State Univ.*, 72 F. Supp.  3d 627, 644–45 (M.D.  La.  2014) (allegations of small but frequent derogatory comments sufficient to survive summary judgment).  Consequently, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."  *Wantou*, 23 F.4th at 432.

all African American" and described his senior staff as "the colored coalition." [Doc. 107, p. 42].

(iv)    In February of 2019, Chief King allegedly "made intimidating and angry faces at Mr. Clark" on two separate occasions as Mr. Clark spoke with Mr. Cooper.  *Id.*  During one of these incidents, Chief King apparently "asked Mr. Clark if [Mr. Clark] was talking about Chief King[] as a method of intimidation." *Id.* at pp. 42–43.

(v)     On one occasion in March of 2019, Chief King allegedly "hurried over and stood in the middle of [a group of black officers, including Mr. Clark] without speaking to them" while "look[ing] at each person with an angry look." *Id.* at p. 43. Mr. Clark describes this as "another incident of Chief King trying to intimidate Mr. Clark." *Id.*

(vi)    In June of 2019, Chief King purportedly "yelled at Mr. Clark in a hostile and demeaning tone", conduct that Mr. Clark describes as "unprofessional" given that "other officers observed the incident." *Id.*

(vii)   That same month, Chief King allegedly "confronted Mr. Clark in a hostile manner" about a prior conversation Mr. Clark had with other APD officers. *Id.*  at pp. 43–44.

(viii)  In October of 2019, Chief King's "tone became loud and demeaning towards Mr. Clark" after the two had a work disagreement regarding the APD's narcotics division. *Id.*  at p. 44.

(ix)    Finally, during a departmental meeting in October 2019, Mr. Clark was allegedly "verbally attacked" by Mr. Vandyke and another APD officer. *Id.*  Mr. Clark claims that "Chief King did nothing to reprimand those officers and [] also spoke to Mr. Clark in a demeaning tone." *Id.*

Mr. Clark's allegations are insufficient to comprise a hostile work environment claim as a matter of law.  This is true for three reasons.  First, most of Clark's allegations do not bear any relationship to race, and there is otherwise no evidence indicating that the complained-of conduct was racially motivated.  *See Brew v. Weyerhaeuser NR Co.,* 537 F. App'x 309, 313 n.9 (5th Cir.2013) ("We do not consider

other incidents of alleged harassment not based on race … because [plaintiff] has no evidence 'that the non-race-based harassment was part of a pattern of race-based harassment.'"); *Rome-Bienemy v. Children's Hosp.,* 2015 WL 8600689, at *8 (E.D. La. Dec. 14, 2015) ("Title VII does not provide a cause of action for work environments that are simply 'hostile.'") (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir.2012)); *Russell v. Louisiana through Div. of Admin.*, 2006 WL 8432078, at *8 (M.D. La. Oct. 3, 2006) (granting summary judgment where "none of the defendants made derogatory statements to [plaintiff] regarding her race"). Because conduct "with no clear connection to race … [is] not probative of a *race-based* hostile work environment," most of Clark's allegations do not support his hostile work environment claim. *Rome-Bienemy,* 2015 WL 8600689, at *8 (emphasis in original).

Second, two of the incidents described by Clark involve alleged harassment directed at someone other than himself. Although "a plaintiff for some purposes … [may] introduce evidence of discrimination of others" to support their hostile work environment claim, offensive comments that do not target the plaintiff are given limited weight. *See Septimus v. Univ. of Houston,* 399 F.3d 601, 612 (5th Cir. 2005) (dismissal appropriate in part because the plaintiff" did not personally experience most (if not all) of the conduct complained of by the other women."); *Collier v. Dallas Cnty. Hosp. Dist.*, 827 F. App'x 373, 378 (5th Cir. 2020) (summary judgment proper in part because inappropriate comments were not directed at the plaintiff); *White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 381 (5th Cir. 2012) (dismissal proper in part because "[n]one of [the plaintiff's allegations] involved physically threatening or humiliating conduct … [and] the [most offensive] comment was not directed at

[plaintiff]"); *Edwards v. Louisiana Cmty. & Tech. Coll. Sys.*, 2012 WL 1391662, at *2 (W.D. La. Apr. 20, 2012) (dismissal proper where most of the complained-of statements "were [not] directed at Plaintiff."); *Williams v. KTVE/KARD TV Station*, 2013 WL 1908298, at *4 (W.D. La. May 7, 2013) (summary judgment proper where the alleged "remarks and/or incidents were not directed toward plaintiff."); *but see Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 653 (5th Cir. 2012) (noting that "[w]e have held in the context of sex discrimination that harassment of women other than the plaintiff [can be] relevant to a hostile work environment claim.").

Third, the one alleged comment by Chief King that does relate to race and was directed, at least in part, at Clark is insufficient standing along to survive summary judgment.  To be clear, this allegation – that Chief King described his leadership team as "the colored coalition" – both relates to race and is objectively and subjectively offensive.  But considering jurisprudence from the Fifth Circuit and other courts, it is simply not "severe" enough as a matter of law to have altered the conditions of Clark's employment.  *Cf. White v. Gov't Employees Ins. Co.,* 457 F. App'x 374, 381 n.35 (5th Cir.2012) (describing the "kinds of verbal harassment that [the Fifth Circuit] and other circuits have held would support a [] hostile work environment claim."); *see also Molden v. E. Baton Rouge Par. Sch. Bd.*, 715 F. App'x 310, 316 (5th Cir. 2017) ("The legal standard for workplace harassment in this circuit is … high."); *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745, *reh'g denied sub nom. Wantou v. Wal-Mart Stores Texas, L.L.C*, 143 S. Ct. 1049 (2023) (noting that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the

terms and conditions of employment.").  Accordingly, because Clark has insufficient evidence of *severe or pervasive* conduct altering the conditions of his employment and thereby creating abusive working environment, summary judgment is appropriate as to his hostile work environment claim.

### ii.   **Cooper's Claims**

Next, Cooper claims that the APD "has been a hostile work environment due to the racial prejudice … that was manifested in its majority [] Caucasian uniform officers, including [Chief King], since [1977]."  [Doc. 49-5, p. 1] (Cooper's affidavit).  In support of this contention, Cooper alleges the following:

(i)    Mr. Cooper claims that "Caucasian officers" were frequently given overtime positions.  *Id.* at p. 2.  In contrast, Cooper was apparently forced to "file a grievance to work the Rapides Parish Fair for overtime with the City of Alexandria" sometime in 1990.  *Id.*

(ii)   In 2013 or 2014, a white APD officer allegedly referred to Cooper as a "nappy head."  *Id.*

(iii)  On an unspecified date, Cooper's supervisor allegedly told him that "you people do not get sick," apparently referencing to black APD officers.  *Id.*

(iv)  In 2014 or 2015, in front of Cooper and several other white officers, a white APD officer allegedly told a white captain to "show [him the] 'silver dollar you have in your pocket.'"  *Id.*[12]  All the white officers then laughed.  *Id.*  According to Cooper, another white officer then referenced a "television special [regarding] the KKK" while another exclaimed, "look out [n-word], the Klan is getting bigger."  *Id.*

(v)   In 2020, Cooper became "the first African American Assistant Chief in the history of the Alexandria Police Department."  *Id.* at p. 4.  According to Cooper, despite his rank, he was "tak[en] out of the chain of Command

---

[12]    According to Cooper's affidavit, "a silver dollar in a Caucasian's pocket … show[s] that he would be [involved with] the inner works of the Ku Klux Klan[.]"  [Doc. 49-5, p. 2].

by Chief King," who would "frequently allow subordinates to come directly to him and bypass [Cooper]." *Id.*

(vi)    In February or March of 2020, Cooper purportedly "advised Chief King that [the APD] needed to hire more minorities[.]" Chief King allegedly replied by stating that "we do not have to hire minorities," explaining that he was "not going to lower the [APD's] standard to hire minorities." *Id.*

Mr. Cooper's allegations are likewise insufficient to establish the existence of a hostile work environment. First, as with Clark's claim, several of Cooper's allegations are thoroughly unrelated to race and therefore "do not sustain a race-based hostile work environment claim." *See Baker v. FedEx Ground Package Sys. Inc.,* 278 F. App'x 322, 329 (5th Cir. 2008); *see also supra*; *Brown v. Beverly Indus., LLC*, 2015 WL 1125270, at *5 (E.D. La. Mar. 12, 2015) (harassment "not based on race … cannot sustain a race-based hostile work environment claim."). Additionally, two of Cooper's other allegations – specifically the "nappy head" and "you people do not get sick" comments – though racially offensive, are insufficient, in and of themselves, to "affect[]a "term, condition, or privilege" of his employment. *See, e.g., Cavalier v. Clearlake Rehab. Hosp., Inc.,* 306 F. App'x 104, 107 (5th Cir. 2009) (defendant's three comments – one where defendant told plaintiff he would "beat the tar off of him" and two involving the use of the word "boy" – did not "rise to the level of severity or pervasiveness required to show a hostile work environment"); *Baker*, 278 F. App'x at 329 ("[Defendant's] other comments – that 'she did not want to work with people like' [plaintiff] and that 'whites rule' – are race-related incidents, but they

are not sufficiently severe and did not unreasonably interfere with [plaintiff's] work performance.").

Finally, Cooper's allegation regarding the 2014 or 2015 incident of another APD officer overtly referencing the Ku Klux Klan and using the "n-word" while in his presence is both humiliating, highly offensive, and, if true, undoubtedly warranted discipline.  However, an incident of this severity is alleged to have occurred only once over the course of Cooper's 30-year-long career with the APD and was not directed at him.  Further, Cooper was subsequently promoted to Assistant Chief of the APD, and he has otherwise produced no evidence indicating this event affected any term of his employment. *Compare Higgins v. Lufkin Indus., Inc.,* 633 F. App'x 229, 230, 235 (5th Cir. 2015) (two instances of inappropriate comments in one year – one of which included the phrase "n-word bitch" – insufficiently "severe or pervasive" to create a hostile work environment) *with Walker v. Thompson*, 214 F.3d 615, 619–22 (5th Cir. 2000) (summary judgment improper where offensive remarks were allegedly constant over the course of three years and included "comparisons to slaves and monkeys, derisive remarks regarding [plaintiffs'] African heritage, patently offensive remarks regarding the hair of African–Americans, and conversations in which a co-worker and supervisor used the [n-word]."); *see also Buisson v. Bd. of Sup'rs of Louisiana Cmty. & Tech. Coll. Sys.*, 592 F. App'x 237, 245 (5th Cir. 2014) (collecting cases and explaining that "[defendant's] use of the bigoted term 'chink' was isolated … [and] its one-time utterance is insufficient … to create a race- or national-origin-based, hostile work environment."); *Johnson v. TCB Const. Co.,* 334 F. App'x 666, 671 (5th Cir. 2009) ("[A]lthough [defendant's] alleged comment to [plaintiff] that he was just 'like a damn

[n-word]' … is repulsive, it is isolated and [plaintiff] has offered no evidence concerning its objective effect on his 'work performance.'"); *Culbert v. Cleco Corp.*, 926 F. Supp. 2d 886, 898 (W.D. La.), *aff'd*, 538 F. App'x 504 (5th Cir. 2013) (summary judgment proper where "[plaintiffs] claim is based upon sporadic conduct and isolated incidents that occurred over the course of his entire employment which spanned over twenty-five years."). All told, because Cooper has insufficient evidence of severe or pervasive conduct altering the conditions of his employment and thereby creating abusive working environment, summary judgment is appropriate with respect to his hostile work environment claim.

### iii.   Green's Claims

Finally, Green claims that "[r]acial prejudice was manifested within the [APD]" throughout the course of his career. [Doc. 107-5, p. 1]. In support of his hostile work environment claim, Green makes the following allegations:

(i)    Sometime in the mid-nineties, Green claims that "approximately eleven black officers left the [APD] due to [unspecified] racial prejudice and oppression that permeated the APD and were implemented or acquiesced in by the APD administration." *Id.* at p. 2.

(ii)   On unspecified dates, Green recalls black APD officers being referred to as "Lower Third Coon[s]," apparently in reference to "an area of Alexandria populated by African American citizens." *Id.*

(iii)  On an unspecified date, a black APD officer was a called a "Chocolate Bunny" by a senior white officer. *Id.*

(iv)   On an unspecified date, a black APD officer found watermelon left in his vehicle. *Id.* A white APD officer later "brought a box of chicken … and

placed it in front of [the black APD officer] and stated, 'I heard you people like chicken and watermelon.'" *Id.*

(v)     Sometime in 2013, following Green's promotion to Deputy Chief, an unknown person left a message on the blackboard in a common area that read, "A new SUV, a new Chief, and his trunk monkey." *Id.* at p. 3.

As with Clark and Cooper, Green's allegations are insufficient under Fifth Circuit precedent to support a hostile work environment claim. Despite being offensive and warranting discipline, four of Green's five allegations relate to the harassment of someone other than Green and – as discussed above – these incidents are of limited evidentiary value. *See supra.* Additionally, as with Cooper, Green does not allege harassment that is "severe or pervasive" enough to "affect a "term, condition, or privilege" of his employment, particularly when considered against the backdrop of Green's roughly 30-year-long tenure with the APD and eventual promotion to Deputy Chief. Summary judgment is therefore proper with respect to Green's hostile work environment claim.

## III.   *Monell* **Claims**

Next, a local government entity may be liable under Section 1983 if either: (i) that entity "cause[s] a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers;" or (ii) a "constitutional deprivation [occurs] pursuant to a governmental custom, even if such custom has not received formal approval." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (describing the cause of action promulgated by *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)) (internal citations omitted). A *Monell* claim is thus comprised of three elements: (i) a policymaker; (ii)

an "official policy" or "governmental custom;" and (iii) a "violation of constitutional rights whose moving force is the policy or custom." *Id.* (noting that "[t]he elements of the *Monell* test exist to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis.").

Here, Plaintiffs claim that the City and the APD – primarily through Chief King and Terry – has "implemented, acquiesced in, and followed a [custom] of discrimination in hiring, promoting, and disciplining police officer employees on the basis of race[.]" [Doc. 89, p. 37]. But their assertion lacks evidentiary support.

Critically, a *Monell* claim requires the plaintiff to link a "constitutional violation" to a "policy or custom" maintained by a municipality. *Bennett v. Serpas*, 2017 WL 2778109, at *2 (E.D. La. June 26, 2017) (citing *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)); *see also Brown v. Bryan Cty.*, 219 F.3d 450, 457 (5th Cir. 2000) (a *Monell* plaintiff claiming the existence of an unconstitutional "custom" must establish "[a] *persistent, widespread* practice of city officials [that] … is *so common and well settled* as to constitute a custom that fairly represents municipal liability.") (emphasis added); *see also Davidson v. City of Stafford, Texas*, 848 F.3d 384. 396 (5th Cir. 2017), *as revised* (Mar. 31, 2017) ("A pattern requires similarity, specificity, and *sufficiently numerous prior incidents*.") (emphasis added). As this Court has already explained, Plaintiffs have not sufficiently shown specific acts of racial discrimination on the part of the City, let alone a "widespread practice" sufficient to satisfy the standards imposed by *Monell* and its progeny.[13] *See generally*

---

[13]   Throughout the course of this litigation, Plaintiffs have claimed entitlement to *Monell* liability because, from 1978 to 2019, the City was one of several Louisiana municipalities

*supra* (dismissing Plaintiffs' race discrimination claims).   Because Plaintiffs have

failed to provide evidence supporting their claim, summary judgment is appropriate

as to their *Monell* claim.[14]

## IV.   **First Amendment Retaliation**

In addition to their claims of race discrimination, Clark, Cooper, and Green

claim that they have "been retaliated against due to their disclosing to their attorney

[and the FBI] … a civil rights violation" in violation of Section 1983, the First

Amendment, and La. R.S. 23:967.[15]   [Doc. 89, ¶¶ 1, 81–90].   Plaintiffs' Complaint

describes the facts supporting this claim as follows:

> The City's retaliation against Plaintiffs Clark, Cooper, and Green was
> due to their disclosing to an agent of the Federal Bureau of Investigation

---

subject to a Consent Decree issued and overseen by the Eastern District of Louisiana.   *See USA v. City of Alexandria.* No. 2:77-cv-02040-LMA (June 6, 1977); [Doc. 107, p. 16]; [Doc. 89, ¶ 34].

Contrary to Plaintiffs' argument, however, "the fact that the City entered into a Consent Decree [actually] suggests that the City recognized that a problem existed and agreed to remedy it." *See Gomez v. Galman,* 18 F.4th 769, 779 (5th Cir. 2021) (considering and rejecting an identical argument).; *see also USA v. City of Alexandria.* No. 2:77-cv-02040-LMA (June 6, 1977), [Doc. 213] (where the presiding court found that "[the City] utilizes lawful selection processes for the hiring and promotion of police officers and firefighters" and that "with the City's adoption of lawful police officer and firefighter selection processes, the representation of African Americans and women among its police officer and firefighter workforces has improved significantly with respect to the relevant labor pools.").   The prior existence of this Consent Decree, then, does not support a finding of *Monell* liability.

[14]   As an aside, Plaintiffs' Complaint claims that Terry, [Chief] King, and Vandyke … have acted with malice or reckless indifference to the rights of the above-named African American plaintiffs, thereby entitling these plaintiffs to an award of punitive damages" under 18 U.S.C. § 1981a.   [Doc. 89, ¶ 71].   The cited statute, however, requires that Plaintiffs "demonstrate[] that the [defendant] engaged in a discriminatory practice" made unlawful by Section 1981.   18 U.S.C. § 1981a(b)(1).   Because Plaintiffs have not made this required showing, punitive damages are unavailable in this case.

[15]   Clark, Cooper, and Green also claim that the APD "fail[ed] … to comply with the procedural provisions of [La.] R.S. 40:2531 [which] amounted to a denial of due process granted to Plaintiffs by the provisions of the Fourteenth Amendment to the U.S.

("FBI") a civil rights violation ("excessive force") involving a firearm committed by a senior Caucasian APD officer ... upon an African American suspect [in 2019], which aggravated assault was recorded by [the white APD officer's] body camera ...

Legal counsel with whom the senior officers consulted [later] recommended and facilitated a Zoom audio/video conference with an agent of the FBI. During that conference, Plaintiff [sic] and the aforesaid senior officers reported the [alleged] civil rights violations of [the white officer] and the acquiescence therein by [Chief] King, [Mr.] Terry, and the City.[16]

*Id.* at ¶¶ 5–7, 19, 21, 24. Following these events, Plaintiffs claim that Clark, Cooper, and Green were retaliated against in two respects. First, all three plaintiffs claim they were subjected to several "illegal investigation[s]" following their collective contact with their attorney and the FBI. [Doc. 107, p. 38]; *see also* [Doc. 107-5, p. 11] (where, in his affidavit, Green claims that he "was under investigation for no reason

---

Constitution." [Doc. 89, p. 34]. Plaintiffs do not, however, explain the factual basis for this contention. *See id.*; *see also* [Doc. 104, pp. 62, 74] (making an identical statement without providing any factual predicate that would support such an allegation). Accordingly, insofar as Clark, Cooper, and Green have alleged a violation of La. R.S. 40:2531, those claims are dismissed.

[16] Relatedly, Clark, Cooper, and Green have also asserted a claim under Louisiana's Whistleblower Statute arising from their disclosure of this same alleged "civil rights violation." *See* La. R.S. 23:967(A) ("An employer shall not take reprisal against an employee who ...[d]iscloses or threatens to disclose a workplace act or practice that is in violation of state law."); *see also Brown v. City of Alexandria,* 2022 WL 2873666 (W.D. La. July 21, 2022) (the lawsuit arising from the alleged civil rights violation referenced by Plaintiffs' Complaint and in which this Court found that material issues of fact precluded summary judgment).

Here, assuming a state law violation occurred in the incident discussed in *Brown,* Clark, Cooper, and Green have failed to adduce any facts linking their alleged discussions with their attorney and the FBI to their discharges and demotions. *See Hale v. Touro Infirmary,* 2004-0003, p. 10 (La. App. 4 Cir. 11/3/04), 886 So. 2d 1210, 1216, *writ denied,* 2005-0103 (La. 3/24/05), 896 So. 2d 1036 (a viable Whistleblower requires that plaintiff prove an adverse employment action was "the result of [their] ... threat to disclose the [unlawful] practice."). Summary judgment is appropriate as to Clark, Cooper, and Green's Louisiana Whistleblower claim.

other than to discriminate against [him], to retaliate against [him], and to harass [him] for reporting a civil rights violation."). Mr. Clark and Cooper likewise characterize their respective discharges as retaliatory acts arising from the same events that precipitated these allegedly "illegal investigation[s]," and Green makes a similar characterization with respect to his demotion. *See* [Doc. 89, ¶¶ 19–21].

The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (internal quotations omitted). In the Fifth Circuit, a plaintiff asserting a First Amendment retaliation claim must show that: (i) the plaintiff suffered an adverse employment decision; (ii) the plaintiff engaged in speech involving "a matter of public concern;" (iii) the plaintiff's interest in speaking outweigh the defendant's interest in promoting efficiency; and (iv) the protected speech motivated the defendant's conduct, *i.e.*, that there is "a causal connection between the government's retaliatory animus and his subsequent injury." *Lewis v. Panola Cnty., Mississippi*, 2022 WL 17496048, at *2 (5th Cir. Dec. 8, 2022); *Lehman v. Guinn*, 2021 WL 935887, at *9 (W.D. La. Feb. 9, 2021), *report and recommendation adopted,* 2021 WL 929885 (W.D. La. Mar. 10, 2021).

The Court addresses only the fourth element – assuming without deciding that the first three elements have been met. A First Amendment retaliation claim requires the plaintiff to demonstrate that their speech was the "but-for cause" of a given adverse employment action. *Nieves*, 139 S.Ct. at 1722 (noting the plaintiff must show that "the adverse action against the plaintiff *would not have been taken* absent the retaliatory motive.") (emphasis added). To establish this element of their *prima*

*facie* case, a plaintiff must "present either direct evidence of retaliation or circumstantial evidence [which creates] a rebuttable presumption of retaliation." *Lewis,* 2022 WL 17496048, at *2 (cleaned up).

Here, Clark, Cooper, and Green have not established a viable retaliation claim. This is true for three reasons. First, the record is simply devoid of any "direct evidence" indicating that the APD's conduct was motivated by Plaintiffs' contact with their attorney or with the FBI.  *See generally* [Docs. 89, 107].

Second, although "close timing between an employee's [speech] and an adverse employment action can be a sufficient basis for a court to find a causal connection," neither Clark, Cooper, nor Green have identified any evidence as to *when* they allegedly reported this conduct to their attorney and the FBI or *when* the APD learned of this alleged contact.[17]  *See generally* [Doc. 107] (Plaintiffs' Opposition); [Doc. 89] (Plaintiffs' Complaint); [Doc. 49-5] (Cooper's affidavit); [Doc. 107-2] (Clark's affidavit); [Doc. 107-5] (Green's affidavit); *see also RSR Corp. v. Intl. Ins. Co.,* 612 F.3d 851, 857 (5th Cir. 2010) ("The court has no duty to search the record for material fact issues.  Rather, the party opposing [] summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim.") (internal citations omitted).  Looking at timing alone, there is thus

---

[17]     As in the employment discrimination context, a plaintiff may demonstrate the fourth element of their *prima facie* retaliation claim by showing that they were "treated different from other [employees] with similar records."  *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson,* 9 F.4th 328,  332–33 (5th Cir. 2021).  As discussed in detail *supra,* Clark, Cooper, and Green have failed to identify an adequate comparator, and the Court will not reexamine their arguments to the contrary.  *See id.* (dismissal proper where "none of the officers [plaintiff] identifie[d] had disciplinary histories [comparable] to his [and] none had [his level of] experience[.]").

insufficient evidence from which a jury could infer a causal connection between Clark, Cooper, and Green's contact with their attorney and the FBI and their respective adverse employment actions. *See generally* [Docs. 89, 107]; *see also Mooney v. Lafayette Cnty. Sch. Dist.,* 538 F. App'x 447, 454 n.7 (5th Cir. 2013) (noting that "temporal proximity is just *one* of the elements in the entire calculation of whether plaintiff had shown a causal connection between the protected activity and the subsequent [adverse employment action].") (cleaned up) (emphasis added).

Finally, even assuming Clark, Cooper, and Green could establish a *prima facie* case of First Amendment retaliation, an employer "may avoid liability by showing a legitimate reason for which it would have discharged [or demoted] the employee even in the absence of [the employee's] protected conduct." *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 330 (5th Cir. 2021) (describing the so-called *Mt. Healthy* defense) (internal citations omitted). As described at length above, it is undisputed that: (i) Clark repeatedly misused APD's NCIC "Thinkstream" database to conduct searches unrelated to his duties with the APD; (ii) Cooper failed a polygraph examination and conducted an unauthorized investigation of another APD officer; and (iii) Green lied during an Internal Affairs investigation. *See supra.* Because these facts justify the adverse employment actions taken against Clark, Cooper, and Green, summary judgment is appropriate as to their First Amendment retaliation claim.

## V.   Eavesdropping Claims

Finally, Clark, Cooper, and Green maintain that on June 13, 2019, Chief King "intercepted a conversation they were having about an accident in which [Chief] King

was involved" in violation of 18 U.S.C. § 2511.  [Doc. 107, p. 52]; [Doc. 89, ¶ 66].  Mr.

Green's affidavit describes the facts supporting this claim as follows:

> [Chief] King had a collision in a city vehicle, did not report the accident,
> and left the scene of the collision.  Reginald Cooper, Darrell Clark, and
> I were on the back lot talking about how [Chief] King had wrecked the
> vehicle.  After ten to fifteen minutes of that conversation, [Chief] King
> burst out the door and started yelling at us about "if we wanted to know
> something about him and the accident, we needed to ask him."  We knew
> [Chief] King was not in our conversation and clearly had been listening
> to our conversation from the camera system.  I [later] asked [another
> APD officer] if the camera system had sound and he replied, "Yes."

[Doc. 107-5, p. 9].

Colloquially known as the Wiretap Act, 18 U.S.C. § 2511 "imposes criminal

liability upon any person who 'intentionally intercepts, endeavors to intercept, or

procures any other person to intercept or endeavor to intercept any wire, oral, or

electronic communication.'"  *DIRECTV, Inc. v. Bennett,* 470 F.3d 565, 569 (5th Cir.

2006).  In tandem with 18 U.S.C. § 2520, this statute also "provide[s] a [civil] private

cause of action for the intentional interception of electronic communications,

including both satellite and cable transmissions."  *Joe Hand Promotions, Inc. v.

Breaktime Bar, LLC*, 2014 WL 1870633, at *1 n.3 (W.D. La. May 8, 2014).

With respect to the civil cause of action, 2511(1)(c) and (d) of the Wiretap Act

"prohibits the intentional disclosure or use of information obtained through a wire

intercept if the person doing so 'knew or had reason to know that the interception

itself was in violation of [the Wiretap Act]'. Liability for disclosure or use requires

proof that it was intentional, that the information was obtained from an intercepted

communication, and that the defendant knew or should have known that the

interception was illegal. Accordingly, 'knowledge or reason to know of the illegality is

an element of this offense'.  *Forsyth v. Barr*, 19 F.3d 1527, 1538 (5th Cir. 1994) (internal citations omitted).

With respect to the incident described above, Clark, Cooper, and Green maintain that "[the] City and [Chief] King have intentionally intercepted … [their] oral communications in violation of 18 U.S.C. § 2511(1)(a) … [and that] there is a strong likelihood that [both] Defendants are now engaging in and will continue to engage in the above-described intentional interception … and that likelihood represents a credible threat of immediate future harm."  [Doc. 89, ¶¶ 93, 95].  Although the Complaint is unclear, Clark, Cooper, and Green presumably seek injunctive relief provided by 18 U.S.C. § 2520(b)(1) as well as possibly statutory damages contemplated by § 2520(b)(2).   Even assuming this statute is applicable to the facts alleged – which is questionable – their claim nonetheless fails.

First, as discussed above, Chief King has asserted qualified immunity with respect to every claim brought against him individually.  *See generally* [Doc. 100-1].  Although a "good-faith assertion of qualified immunity" means the plaintiff bears the burden of establishing its inapplicability, Plaintiffs' Opposition entirely ignores the applicability of the defense.  *See generally* [Doc. 107]; *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (noting that "[the] assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.").

Second, the record is devoid of evidence that Chief King overheard – intentionally or otherwise – Plaintiffs' conversation using the APD's camera system or, if he did, that he unlawfully disclosed or used the information obtained from his

alleged intercept.  *Forsyth*, 19 F.3d at 1538 (5th Cir. 1994).  Accordingly, summary judgment is appropriate as to Plaintiffs' claims under 18 U.S.C. § 2511.

CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's MOTION FOR SUMMARY JUDGMENT [Doc. 100] is GRANTED, and that all claims asserted by Plaintiffs Darrell Eugene Clark, Reginald David Cooper, Markiz Marta Hood, Cedric Linbert Green, and Tyrika Trenea Love are DISMISSED WITH PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 12th day of September 2023.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE